## Case No. 6,903.

### In re HUNTER.

[18 N. B. R. 504.] [1]

District Court, W. D. Tennessee. Dec., 1878.

BANKRUPTCY—PUBLIC SALE—PUBLICATION OF NOTICE.

It is imperative under the statute that notices of all public sales shall be published for three consecutive weeks, whether the assignee or other officer proceeds under the power given him by the statute or under a special order of the court, and there is no power in the court or judge to change this requirement.

[In bankruptcy. In the matter of Mrs. M. C. Hunter.]

To Hon. E. S. Hammond, Judge of Said Court: Your petitioner respectfully represents that he was elected assignee of the above estate, just prior to the yellow fever. The assets, consisting of millinery, did not come into his hands until the fourteenth day of August, when there was no sale for them; the same have been boxed and stored for several months. The petitioner has earnestly, but unsuccessfully, endeavored for a few days to secure a favorable offer for said stock without success, it being unseasonable and unsalable; and he is satisfied, after a thorough examination of the stock, and having had it examined by persons acquainted with its value, that the said stock ought to be sold at public auction. Petitioner has rented a very cheap and well-located small store-room, where the said stock is being opened; and as he has no authority to sell at public auction without giving three weeks' notice by advertisement, he respectfully asks for an order of sale, authorizing him to sell at auction on the sixteenth day of December, 1878, to save the expense of rent and other expenses that will amount to more than the value of the goods.          O. Wooldridge, Assignee.

Memphis, Tenn., December 10th, 1878.

---

## Case No. 6,904.

### The HUNTER.

[1 Ware (249), 251.] [1]

District Court, D. Maine. Feb. Term, 1833.

BOTTOMRY BOND—COLLATERAL SECURITY—INTEREST.

1. A bottomry bond, entered into by the master of a vessel, is not rendered void by his drawing a bill of exchange on his owners for the same sum for which the bond was given.

[Cited in The Eureka, Case No. 4,547.]

2. A bill of exchange, in such a case, is not an independent security payable at all events. It is collateral to the bond, and is subject to the

---

[1] [Reprinted by permission.]

[1] [Reported by Hon. Ashur Ware, District Judge.]

same contingencies, and a discharge of one security is a discharge of both.

[Cited in Maitland v. The Atlantic, Case No. 8,980; Greely v. Smith, Id. 5,750.]

3. When a merchant advances money towards repairing a vessel, on the personal credit of the owner, he cannot, after it is expended, demand the security of a bottomry bond, with maritime interest.

[Cited in Greely v. Smith, Case No. 5,750.]

4. Quere, whether a bond in such case, though void as a bottomry bond carrying maritime interest, may be a valid security for the principal sum advanced, with land interest.

5. A bottomry bond may be held by a court of admiralty good for a part and bad for a part.

[Cited in Maitland v. The Atlantic, Case No. 8,980; Greely v. Smith, Id. 5,750.]

6. So a court of admiralty has authority to moderate the maritime interest when it is manifestly exorbitant.

[Cited in The Clotilda, Case No. 2,903.]

7. A libellant may unite in one libel an allegation founded on the hypothecation implied by the law for money advanced for repairs, with an allegation on a bottomry bond given for the same consideration.

[Cited in Clark v. Laidlaw, 4 Rob. (La.) 345.]

This was a libel on a bottomry bond given by Leavitt, acting as master of the brig Hunter, for advances made for repairing her and fitting her for sea. The material facts are, that in May, 1829, Houdlette, the claimant, purchased the brig at Gustavia, in the Island of St. Barts. At the time of the purchase, she was in a condition requiring considerable repairs. Before he had left the place he engaged some work to be done upon her, and procured some materials. When he left, he put Leavitt, who was at Gustavia in another vessel of Houdlette's, as second mate, in charge of the vessel, to superintend the repairs, and directed him to call on Bailey, the libellant, for such advances as should be wanted, which Bailey agreed to make. Houdlette then returned to Bath, intending to send out Capt. Theobald to take the vessel home. The witnesses examined at Gustavia state that if Theobald did not arrive in season, Bailey was directed by Houdlette to put in Leavitt as master, and send the vessel to Bath. Leavitt contradicts this statement. The conflicting testimony of the witnesses on this point is not easily reconciled but upon the supposition that the matter was left with a loose and somewhat indefinite understanding between the parties. Mr. Harrison, the American consul, whose deposition was taken in the case, states that in the event mentioned of the non-arrival of Theobald, Bailey was authorized to put in Leavitt as master, for the purpose of navigating the vessel home; and Theobald not arriving, this was accordingly done, and the consul indorsed his name on the register, as master. Leavitt then gave the bond to Bailey on which the libel is founded, and at the same time drew a bill on the owners for the same sum.

Mr. Mitchell, for libellant.

Mr. Shepley, for claimant.

WARE, District Judge. Several objections are made to the validity of this bond. In the first place, it is contended that Leavitt was not appointed master by any competent authority, and that he could not, therefore, bind the vessel, under any circumstances, by a bottomry bond. The evidence on this point is not free from difficulty. Mr. Harrison, the American consul, says that Houdlette, on leaving Gustavia, gave orders that if Captain Theobald, whom he intended to send out to take the command of the vessel, did not arrive in season, Leavitt should be put in as master for the purpose of navigating her home. The witness, however, does not mention the means he had of knowing this fact. It may perhaps be presumed that he had it from Houdlette himself, but as the fact is controverted, it would have been more satisfactory if he had stated how he came to the knowledge of it. It would then be more easy to determine the degree of authority which might be justly attached to his testimony. There is no intrinsic improbability in his statement. If Mr. Houdlette had determined, on his return, to send out a master to take the command of the vessel, it was natural, and it would seem prudent, to leave a discretionary authority with his agent at Gustavia to provide for the contingency of the master's not arriving, who should be dispatched from this country. At the same time, if his intention was, in such a case, that Leavitt should take the command, we should naturally expect that he would have been informed of the arrangement. But if Leavitt is to be believed, no such arrangement was made known to him; on the contrary, he says that Houdlette's orders to him were, that after superintending certain repairs of the vessel, he should either wait the arrival of Theobald, or take passage home in some other vessel, and that he had actually engaged his passage home when he was called on by Bailey to take the command of the vessel. But it is to be remarked that two witnesses, examined at Gustavia, state in their depositions that Leavitt told them that he was directed to take the brig home, provided Theobald did not arrive in season. This is not, indeed, admissible as evidence of the principal fact, but it may go to raise some doubts as to the reliance which may be placed on the accuracy of this witness's recollection upon the subject.

But supposing the objection of the want of authority in Leavitt to bind the owners by such an instrument overcome, it is contended that the bond is void because a bill of exchange was drawn by Leavitt, acting as master, on the owners, for the same sum. In the case of The Augusta, 1 Dod. 283, Lord Stowell considered that the taking of a bill of exchange by the holder of a bottomry bond was a strong circumstance to show that the advances were made on the personal credit of the owners, and not on the

credit of the vessel, and he held the bond void for the amount of the bill and good for the advances made after the bill was drawn. But in this case there were other circumstances which went strongly to show that, at the time when the first advances were made, the creditor looked only to the personal responsibility of the owners. He did not, however, intimate an opinion that the simple fact of taking a bill of exchange, as a security in addition to the bond, would, of itself, vitiate the bond. And in the cases of The Jane, 1 Dod. 466, and The Nelson, 1 Hagg. Adm. 179, in both of which bills of exchange were drawn by the master, he treated them as merely collateral to the bond, which, if paid, discharge the bond, but which do not affect its validity. "It is," says he, "the usual practice to draw bills of exchange; there is no inconsistency in taking this collateral security, nor has it ever been held to exclude the bond nor diminish its solidity. It is an erroneous view taken of bills drawn under such circumstances, which would hold them to be independent securities, payable at all events. It is indeed true, that the owners are generally bound to honor the bills drawn by the master for the necessities of the ship. But when a bill is drawn, and a bottomry bond taken, with maritime interest, for the same sum, the bill must share the fate of the bond. Until the vessel arrives in safety at the end of her voyage, the loan is at the risk of the lender, and if she is lost, nothing is due upon the bill more than upon the bond. This risk belongs to the essence of loans made on maritime interest. Emerigon, Contrats à la Grosse, c. 1, § 3. When a bill is therefore drawn, and a bottomry bond given for the same consideration, the owner is not bound to honor the bill, at least not before the safe arrival of the vessel, and the end of the risk. For it does not appear that any thing will ever be due until the happening of the event on which the bond becomes payable, and then the payment of one security extinguishes both.

It is objected that the master has no authority to take up money on bottomry, except in the progress of a voyage, and to enable him to complete an enterprise already begun. If the objection were well founded, it would not be applicable to the present case, because here the advances were made at the request of the owners. But it is not admitted that the authority of the master is confined to such narrow limits as was supposed at the argument. The authority of the master to charge the owners by this contract, is confined to cases of strict necessity, such as usually occur in the progress of a voyage, and are occasioned by unforeseen accidents and disasters. But suppose a voyage is broken up in a foreign port, and a new one is undertaken; if the master is authorized to commence a new voyage the principle will apply with the same reason to such

a case as to one that occurs in the progress of a voyage. The true principle seems to be, that when the master is authorized to employ a vessel in a particular way or in any particular enterprise, and he is obliged to raise money to comply with his orders, he may take it on bottomry, if he cannot obtain it on any other terms. And so it was decided in the case of Crawford v. The William Penn [Case No. 3,373].

But there is another objection which is conclusive against the validity of this instrument as a bottomry bond, carrying maritime interest. It is, that the advances were originally made on the personal credit of the owner. Before Houdlette left Gustavia, Bailey agreed with him to make the necessary advances for repairing the vessel. It is not pretended that there was any thing said at this time about a bottomry bond, and there is not the slightest evidence that any such security was contemplated by either party. There is not only an entire absence of any evidence of that kind, but the testimony directly negatives any such idea. Mr. Harrison states in his answer to the fourth interrogatory, "that the advances were not made by Bailey on account of any pecuniary advantage that would immediately arise therefrom, but from the circumstance of having many friends at Bath, who had favored him with their business, and he felt it his duty to make an exertion, though straitened for means, to get the vessel away, fearing that a reluctance to do so would injure him in their opinion. It is true that, at the time the Hunter was ready for sea, he had partly determined to detain her, in consequence of Houdlette's not complying with his engagement to reimburse his advances, but on the representation of his friends here, as well as myself, whom Leavitt earnestly solicited to use my good offices with Mr. Bailey, he consented to her departure."

It is evident from this testimony that the money was originally advanced on the personal credit of the owner, and the taking of a bottomry bond was an after-thought which arose from some delay of Houdlette, in not remitting the pay so early as was expected. But if a merchant advances money on the personal credit of the owners, he is not at liberty, after it is expended, to turn round and demand bottomry security with maritime interest. If he had intended to have insisted on this, he should have required it in the first instance. An opportunity would then have been given to the borrower to have tried his credit and to have obtained it on less onerous terms. The case of The Hero, 2 Dod. 139, is nearly parallel to the present. In that case, the advances were made before any thing was said of a bottomry bond, and after the ship was cleared out and ready to sail, the creditor interposed and refused to let her depart unless the master would secure the advances by a bottomry bond. The bond was

pronounced bad. The case of The Augusta, 1 Dod. 287, was decided upon the same principle, and the principle has been repeatedly affirmed by the courts of this country. Liebert v. The Emperor [Case No. 8,340]; Sloan v. The A. E. I. [Id. 12,946]; Rucher v. Conyngham [Id. 12,106]; The Aurora, 1 Wheat. [14 U. S.] 96.

Upon the authority of these cases, it is quite clear that, as a bottomry bond, carrying maritime interest, the instrument cannot be supported. But though there is a fatal objection to the instrument as a bond securing maritime interest, it is not perhaps quite certain that the creditor can have no remedy upon it in a court of admiralty, for the principal sum advanced, with land interest. This court, proceeding upon principles of general equity, and not being restrained by the rigid principles of the common law, holds that such a bond may be good for a part and bad for a part. The bond will not be rejected in toto because it is given for a consideration which, in part, the law will not sanction, but it will separate that part which is tainted with illegality, and hold it a good and valid security for the residue. This is a well-established principle of the jurisprudence of the admiralty. The Aurora, 1 Wheat. [14 U. S.] 96; The Packet [Case No. 10,654]; The Tartar, 1 Hagg. Adm. 13, 14; The Nelson, Id. 176; The Gratitudine, 3 C. Rob. Adm. 271. The court has also the power to moderate the maritime interest, when it is manifestly exorbitant, and it is apparent that an undue advantage has been taken of the necessities of the master, though this will be done with great caution. The Packet [supra]; The Zodiac, 1 Hagg. Adm. 326; La Ysabel, 1 Dod. 277.

If the court has authority to separate the good from the bad, and to reduce the maritime premium when an oppressive advantage has been taken of the necessities of the borrower, is it quite certain that it may not, in the exercise of its equitable powers, render judgment, in a case like the present, for the principal sum advanced, with land interest? For so much, the justice of the claim cannot be questioned, and if the bond had been originally taken for that sum, upon what ground could its validity have been controverted? Abb. Shipp. (Am. Ed.) p. 125, note 2. The advances being made in a foreign country, for repairing and refitting the ship, constitute a privileged debt against the vessel. She became hypothecated for the debt by operation of law, and if the creditor had taken no security he might either have seized her for the debt before she sailed, or have followed her to Bath and proceeded against her on the implied hypothecation, and enforced his lien to the exclusion of the general creditors of the owner. Why may not this bond be a valid security for that sum? The case of Rucher v. Conyngham [Case No. 12,106], seems to lead to this conclusion. The court held, in that case, the bond to be bad, but

that the amount of the repairs, if properly proved, must be charged against the defendant. The state of the pleadings does not appear in the report, and it cannot be seen whether there was an allegation in the libel founded upon the consideration for which the bond was given, distinct from that upon the instrument itself. I can see no objection to uniting in the same libel such an allegation with that founded upon the bond. The causes of action are both of the same nature, one being on the express hypothecation of the parties, and the other on that implied by the law, and the course of proceeding is the same. If the libel contained such an allegation, I should feel no difficulty, upon proper proof, in rendering judgment for the libellant for the sums actually advanced, with land interest, nor have I any doubt, if the purposes of justice require it, of the authority of the court to allow, on the motion of counsel, the libel to be amended, in this stage of the proceedings to that effect.

After this opinion was delivered, the libel was amended by filing a new allegation, and a decree was rendered for the libellant, by consent, for six hundred dollars.

———

HUNTER, The. See Case No. 10,326.

HUNTER (ALLEN v.). See Case No. 225.

HUNTER (BOWIE v.). See Case No. 1,731.

HUNTER (COOK v.). See Case No. 3,161.

HUNTER (COURTNEY v.). See Case No. 3,-285.

HUNTER (FOY v.). See Cases Nos. 5,017–5,019.